### BERRY v. STATE.†

(Court of Civil Appeals₋ of Texas. Feb. 22, 1911. Rehearing Denied March 22, 1911.)

1. PHYSICIANS AND SURGEONS (§ 2*)—LICENSE TO PRACTICE MEDICINE — REVOCATION — GROUND.

The failure of Acts 30th Leg. c. 123, to define "grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public," enumerated as one of the grounds for revoking a license to practice medicine, does not invalidate that portion of the act.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 2; Dec. Dig. § 2.*]

2. PHYSICIANS AND SURGEONS (§ 11*)—REVOCATION OF LICENSE — JURISDICTION — SUBJECT-MATTER.

Under the Constitution, as amended in 1891, article 5, § 8, providing that the district court shall have general jurisdiction over all causes of action whatever for which a remedy of jurisdiction is not provided by law or the Constitution, an action to revoke a license to practice medicine is within the jurisdiction of the district court.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

3. PHYSICIANS AND SURGEONS (§ 11*)—REVOCATION OF LICENSE TO PRACTICE MEDICINE —VENUE.

An action to revoke a license to practice medicine is within the jurisdiction of any district court of a county within which at least two acts on which the cause is founded, occurred.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

4. PHYSICIANS AND SURGEONS (§ 11*)—REVOCATION OF LICENSE TO PRACTICE MEDICINE— NATURE OF ACTION.

An action to revoke a license to practice medicine is of a civil nature.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

5. VENUE (§ 17*)—OBJECTIONS.

Where defendant, in an action to revoke a license to practice medicine, objects to the jurisdiction of his person, he should interpose his plea of privilege.

[Ed. Note.—For other cases, see Venue, Cent. Dig. §§ 28–31; Dec. Dig. § 17.*]

6. PHYSICIANS AND SURGEONS (§ 11*)—LICENSE TO PRACTICE MEDICINE—REVOCATION.

In an action to revoke a license to practice medicine for defendant's fraudulent conduct in treating a patient for gallstones, there was no issue as to the difference in treatment by different schools of medicine, where defendant introduced no evidence that the treatment used by him was the recognized treatment in the eclectic school, as assumed by him.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

7. WITNESSES (§ 37*)—COMPETENCY—KNOWLEDGE OF FACTS.

Physicians of the allopathic school may testify as to questions of anatomy for or against a member of any other school.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 80–87; Dec. Dig. § 37.*]

8. PHYSICIANS AND SURGEONS (§ 11*)—LICENSE TO PRACTICE MEDICINE—REVOCATION —PROCEEDING.

Under Acts 30th Leg. c. 123, enumerating as causes for which a license may be denied or revoked, fraud in obtaining or endeavoring to obtain a license, conviction of a crime of the grade of felony, or involving moral turpitude, or aiding or abetting a criminal abortion, and other grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public, or habits of intemperance or drug addiction calculated to endanger the lives of patients, where a petition to revoke a license is based on grossly unprofessional and dishonorable conduct likely to deceive the public, the charge that the jury must find defendant guilty of a felony, or other crime involving moral turpitude, in order to return a verdict for the state was properly refused; each subdivision of the grounds stated being sufficient in itself to justify a judgment of revocation.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

---

9. TRIAL (§ 255*)—INSTRUCTION—REQUESTS—MORE SPECIFIC INSTRUCTION.

In an action to revoke a license to practice medicine on the ground of "grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public," failure of the court to define the quoted phrase is not error, in the absence of a request therefor.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641; Dec. Dig. § 255.*]

10. PHYSICIANS AND SURGEONS (§ 11*)—LICENSE TO PRACTICE MEDICINE—REVOCATION—PROCEEDINGS.

In an action to revoke a license to practice medicine, evidence *held* to present a question for the jury whether the defendant was guilty of grossly unprofessional and dishonorable conduct of a character likely to deceive or defraud the public, so as to authorize the revocation of his license.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

11. PHYSICIANS AND SURGEONS (§ 11*)—LICENSE TO PRACTICE MEDICINE—REVOCATION—PROCEEDINGS.

The petition, in an action to revoke a license to practice medicine for grossly unprofessional and dishonorable conduct of a character likely to deceive and defraud the public, *held* sufficient as against exceptions thereto.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. § 15; Dec. Dig. § 11.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by the State against J. L. Berry. From a judgment for plaintiff, defendant appeals. Affirmed.

Duff & Duff, Brockman, Kahn & Williams, Salliway & McAskill, and Mathis, Buchanan & Stone, for appellant. Ogden, Brooks & Napier, C. W. Howth, James N. Wilkerson, and T. J. Newton, for the State.

FLY, J. This is a suit instituted by the state of Texas through the county attorney of Bexar county, and upon the request in writing of Medical Examiners, against appellant to cancel and revoke his license to practice medicine. It was alleged that the license was dated June 29, 1908, was issued by the State Board of Medical Examiners; that at all times since that time appellant had practiced medicine upon human beings; that in October, 1908, he had taken up a temporary residence in San Antonio, and advertised as a physician and specialist, and especially as being skilled in the treatment and cure of cancers and gallstones; that he had treated Mrs. Freeland for gallstones, promising to remove them for $49; that he gave medicine composed principally, if not entirely, of olive oil; that she took the medicine, believing that it would cure her, and after taking the same passed from her stomach and intestines a large number of balls, of a green color, from one-eighth to three-eighths of an inch in diameter, which were examined by appellant and pronounced gallstones by him, whereas the balls were not gallstones, as appellant well knew. It was further alleged that the medicine was given with the knowledge and intent that it would form balls, which after passage could be used for the purpose of deceiving the patient. Other instances of such deception were pleaded, and it was alleged that appellant knew that his representations were false, that they "were grossly unprofessional and dishonorable and of a character likely to deceive and defraud the public." Appellant answered by general and special exceptions, by general denial, and an attack on the act of the Legislature of 1907, by authority of which the suit was instituted. The cause was submitted to a jury, which returned a verdict for the state, and judgment was entered, revoking the license of appellant to practice medicine in the state of Texas.

We conclude that the facts justified the jury in finding that appellant was guilty of unprofessional and dishonorable conduct such as was likely to and did deceive and defraud the public. The further necessary conclusions of fact are set out in this opinion.

The law of 1907 (Gen. Laws, pp. 224–228) under which this suit was prosecuted provides for a board of medical examiners consisting of 11 men, graduated from the different schools of medicine, and gives them the authority to issue licenses to practice medicine, and provides that a license may be refused when any license, certificate, or diploma illegally or fraudulently obtained has been presented to the board, or fraud practiced in an examination, when there has been conviction for a felony, or any crime involving moral turpitude, or procuring or aiding in a criminal abortion, and when there has been "other grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public." The applicant, who is refused a license, is authorized by the act to have the issue tried in the district court of some county in which a member of the Board of Examiners may reside. In section 12 of the act it is provided: "The right herein to practice medicine in this state may be revoked by any court of competent jurisdiction, upon proof of the violation of the law in any respect in regard thereto, or for any cause for which the State Board of Medical Examiners is authorized to refuse to admit persons to its examinations as provided in section 11 of this act; and it shall be the duty of the several district and county attorneys of this state to file and prosecute appropriate judicial proceedings in the name of the state, on request of any member of the board."

The first assignment of error is, "The court erred in not instructing a verdict for the defendant," and in a statement it is said: "The law does not define what constituted other grossly unprofessional or dishonorable con-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

duct of a character likely to deceive and defraud the public." Using that as a proposition in spite of its label, we think the first case cited by appellant, Morse v. State Board Med. Ex., 122 S. W. 446, effectually disposes of the proposition adversely to appellant. The court said: "While we have pointed out the fact that this case does not involve the revocation of a license or the imposition of any other penalty, we are not to be understood as holding that it would be invalid if the case was of the latter class and involved the question of penalty. Our federal antitrust statute prescribes a penalty against every person entering into a contract or conspiracy in the restraint of trade or commerce among the several states or with foreign nations. Our state anti-trust statute makes it an offense, punishable by heavy penalty, to enter into a contract or conspiracy 'to create or carry out restrictions in trade or commerce or aids to commerce'; and both of these statutes have been unsuccessfully assailed upon the ground that they were too uncertain and indefinite. Waters-Pierce Oil Co. v. State, 48 Tex. Civ. App. 162, 106 S. W. 925, and cases there cited. In fact, unless it be permissible to use language as general as that involved in the statute under consideration, legislation in many instances could not be so framed as to accomplish all that was desired and afford full protection to the public, because of the impossibility of enumerating in detail every separate and distinct act intended to be prohibited." That language was used in regard to the identical part of the statute attacked by appellant, and we adopt it as sound and conclusive, however much it may conflict with the decisions of other states. Human ingenuity could not frame a law that would answer the demands of the decision in the case of Matthews v. Murphy (Ky.) 63 S. W. 785, 54 L. R. A. 415, for it would require that every conceivable unprofessional act should be set out and defined before a license could be revoked for any such act. It may be said, however, that the power to revoke the license was placed in the hands of the Medical Examiners, and the Kentucky court in closing its opinion places its decision on that ground. We prefer the construction placed upon such statutes in the case of Waters-Pierce Oil Co. v. State, herein mentioned, which ran the gauntlet of attack and criticism through all the courts from the district court of Travis county to the Supreme Court of the United States.

The Constitution of Texas, as amended in 1891, article 5, § 8, provides that the district court "shall have general original jurisdiction over all causes of action whatever for which a remedy of jurisdiction is not provided by law or this Constitution," and, as no jurisdiction is specially provided for cases of this character, the district court undoubtedly has jurisdiction to try them. The cause was founded on at least two acts, charged to be fraudulent, which occurred in Bexar county, and any district court of that county had jurisdiction to try it. The action is of a civil nature, and if appellant objected to the jurisdiction of his person he should have interposed his plea of privilege.

In the case of Scott v. State, 86 Tex. 321, 24 S. W. 789, the Supreme Court held that a proceeding to revoke the license of an attorney was a civil action, and that case is similar in its nature to this. Being a civil case, the rules that apply to civil causes are applicable to it.

There was no question in this case as to how different schools treated a patient for gallstones, and, although it is assumed by appellant that the method of treating gallstones was different in the eclectic school of physicians from that in the allopathic or other school of medicine, there was no testimony to sustain such assumption. If appellant desired to raise such an issue, he should have shown that there was a difference in the treatment in the eclectic from that in the allopathic school, and that sweet oil was the recognized specific for gallstones in the ecletic school.

The question in this case was whether appellant had perpetrated a fraud on certain patients by giving them certain medicines that would produce certain substances which he represented to be gallstones and which were not gallstones at all, and that such representations were fraudulently made, with the intent to deceive the parties to whom he gave the medicine, and thereby obtain money from them. It did not take the wisdom and lore of an allopath, the knowledge of a homeopath, the philosophy of an eclectic, or the erudition of an osteopath to fit a man to testify to the chemical elements composing the balls, called by appellant gallstones; but any chemist of any school of medicine could testify as to their composition. Any chemist of any school could tell the soap balls, formed by olive and tartaric acid in the stomach from the calculi or stones, formed in the gall bladder attached to the liver. Any one of any school of medicine, or no school, who had the knowledge, could testify that, if a large quantity of olive oil is given and an alkali is also given, a saponaceous mass will be formed in the stomach and intestines. Any one who had obtained the knowledge could testify to the sizes of the cystic duct and common duct and to the ordinary size of gallstones, and that an ordinary gallstone could not pass from the gall bladder through the duct into the stomach or duodenum. Any one who knew, no matter what school he may have graduated from, could testify as to the character of gallstones, whether hard or soft, and that a canal or duct of the size of a small pea could not form a passage for a stone the size of a hen's egg. No school or system of medicine can change the human anatomy, but it must perforce be the same in all of them, and allopaths could testify

to questions of anatomy for or against a member of any other school.

It is useless to discuss the question of the competency of a physician of one school to testify against a physician of another school as to the mode of treatment of disease, because the testimony fails to show different treatment for gallstones in different schools, and because appellant showed that he belonged to no one school, but was a member of three or more, and was the graduate of several allopathic institutions. He was too much of an allopath himself to object to allopathic testimony, and we are left in the dark as to whether he gave allopathic or eclectic treatment. From the amount of oil and other preparations given the patients, we are justified, perhaps, in presuming that it was not homeopathic treatment. In fact, appellant swore that he had learned the treatment from a physician and from professors in medical schools, and from textbooks. He did not pretend that the olive oil and tartaric acid treatment was taught by the eclectic or any special school, but that it was recognized and accepted in all schools. The allopathic doctors were properly allowed to deny the "soft impeachment."

Appellant testified that he knew that the common duct leading from the gall bladder was too small to accommodate gallstones of much size, that very little, if any, olive oil taken into the stomach could possibly get into the gall bladder, that a gallstone, if dissolved at all in olive oil, must be soaked in it, and the oil must be heated. His testimony alone was sufficient to justify a jury in finding that his treatment was a fraud and that he knew it, and also knew that the material passed by his patients, which he pronounced gallstones, were not gallstones. Knowing that the canal or duct leading from the gall bladder was not larger than a goose quill, he published to the world that forty gallstones as large as pecans had been obtained from a lady patient in San Antonio. And yet he swore that he had not seen any of the matter expelled in connection with the oil treatment. She swore, however, that he did see them and pronounced them gallstones, when he must have known that they were only saponaceous balls formed by the action of the olive oil and alkali.

The statute of 1907 enumerates three causes for which a license may be denied or revoked, the first being fraud in obtaining or endeavoring to obtain a license; second, conviction of a crime of the grade of felony, or involving moral turpitude, or aiding or abetting a certain crime; and, third, "other grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public, or for habits of intemperance or drug addiction calculated to endanger the lives of patients." The three causes for refusing or revoking medical licenses are separate and independent of each other. The petition was based on the last or third specification in the law, and it would have been error for the court to have instructed the jury that they must find appellant guilty of a felony or other crime involving moral turpitude in order to return a verdict for the state under a charge of grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public. Such a charge would have had no application to the pleadings, but would have been in utter disregard of them. Appellant was charged with dishonorable and unprofessional conduct which was calculated to deceive or defraud the public, and such conduct might not necessarily be a crime against the laws of Texas. The gist of the charge was dishonorable conduct calculated to deceive or defraud the public, and the court very properly confined the attention of the jury to that charge. The case of Morse v. Medical Examiners does not hold that when such a charge as this is made proof of a felony or other crime must be made, but merely stated that the unprofessional conduct must be similar in nature to a crime, as is any attempt to deceive or defraud the public. It is similar and close akin to swindling, but all the essentials of swindling need not be proved, in order to justify a verdict of dishonorable or unprofessional conduct. We are of the opinion that each subdivision of the section under consideration is sufficient in itself to justify a judgment of revocation, if supported by facts.

The terms "unprofessional" or "dishonorable" conduct used in the law of 1907 are qualified and modified by the language "of a character likely to deceive or defraud the public," to distinguish them from acts that are unprofessional or dishonorable under the code of ethics prescribed by the honorable profession of medicine that would not, directly at least, react to the disadvantage of the public, such as not advertising, of not entering into a consultation with an attending physician without his consent, and other acts that go to form and constitute the code of the honorable and upright practitioner of medicine. The law leaves the enforcement to the medical profession of its rules of ethics, and, however conducive they may be to creating and preserving the high standard of one of the most important and honored professions in the world, takes no cognizance of them, and does not seek to enforce them, except in so far as their infraction may infringe upon the rights and welfare of the public. But when the unprofessional conduct of the member of the medical profession is of such a character as to deceive or defraud the public, then the law denounces such conduct, and strips the offender of the means which make it possible to impose upon the credulous and unwary. Such unprofessional conduct would necessarily be closely allied to crime, because it is defrauding the public, and yet it was never intended to confine such conduct to the kind or class of offense

that is denounced by the Criminal Code of Texas. That is provided for in a different subdivision of the statute from the one under which this case is prosecuted.

The court submitted the matter in controversy in the language of the statute, and if appellant desired a definition of "other grossly unprofessional or dishonorable conduct of a character likely to deceive or defraud the public" given to the jury he should have requested it. Clearly the failure to define the clause was an error, if at all, of omission and not commission, and under such circumstances special charges must be requested, and that rule was not observed by appellant. Chaddick v. Haley, 81 Tex. 617, 17 S. W. 233.

The question as to whether appellant had been guilty of conduct which rendered him amenable to the statute, was one of fact to be determined by the jury, and it would have been error under the facts of this case to have withdrawn the facts from the jury, as was the object of the first and third special instructions requested by appellant. The court fully and fairly rested the culpability of appellant upon knowledge of the effect of the medicines and the knowledge that the substance passed by the patients were not gallstones, and in addition gave a special charge requested by appellant, in which the jury were instructed that, if appellant believed the medicine would effect the cure of gallstones—the disease with which the patients were affected—the verdict should be for appellant, even though the medicines did not and could not remove gallstones. The knowledge of appellant was made the turning point in the case. The petition fully sets forth the unprofessional and dishonorable conduct of appellant. It clearly states the conduct of appellant in connection with different patients, giving in detail the false representations and the fraud perpetrated, and then alleges that such acts constituted "grossly unprofessional and dishonorable conduct of a character likely to deceive and defraud the public." The knowledge of the falsity of representations made, and the intent to defraud were clearly and explicitly set forth. The court did not err in overruling the exceptions to the petition.

The judgment is affirmed.