Donald Martin Le PERE, M.D.,
Appellant,

v.

TEXAS STATE BOARD OF MEDICAL
EXAMINERS, Appellee.

No. C14–82–405CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 26, 1983.

Rehearing Denied July 7, 1983.

Claude T. Allen, Allen & Allen, Houston, for appellant.

Mark White, Atty. Gen., Austin, John W. Fainter, Jr., First Asst. Atty. Gen., Richard E. Gray, Executive Asst. Atty. Gen., Paul R. Gavia, Bill Campbell, Asst. Attys. Gen., for appellee.

Before JUNELL, MURPHY and SEARS, JJ.

OPINION

SEARS, Justice.

This is an appeal from a state district court judgment affirming the October 23, 1981 order of Appellee revoking Appellant's license to practice medicine. We affirm.

The record reflects that agents of Appellee audited Appellant's medical records for

the period of March 8, 1979, to March 10, 1981, and found that Appellant had purchased 148,700 dosage units of the drug methaqualone (trade name "Quaalude"), at 300 milligrams each. Of these dosage units 14,242 were unaccounted for. A Department of Public Safety (D.P.S.) audit for the period May 11, 1979, to May 5, 1981, showed Appellant purchased 144,900 dosage units of methaqualone, at 300 milligrams each. Of these dosage units, 7,432 were unaccounted for. The differences in the drugs unaccounted for between the two audits was caused by the credit given by an agent of D.P.S. for the "Home Care and Research Studies" that Appellant was conducting with his two sons, utilizing the drug. In October, 1981, Appellee charged Appellant with a violation of Tex.Rev.Civ.Stat.Ann. art. 4505(4)(B) (Vernon 1976), alleging that his failure to keep complete and accurate records of controlled substances violated the statute. On October 23, 1981, after conducting a hearing on the charge, Appellee issued an order revoking and cancelling Appellant's license to practice medicine. Appellant perfected his appeal to the 269th District Court of Harris County, Texas. On March 8, 1982, the court remanded the cause to Appellee for further findings of fact and conclusions of law. In April, 1982, pursuant to a conference call public meeting, Appellee Board unanimously concluded that Appellant's conduct was of a type that was likely to deceive or defraud the public. The Board filed supplemental findings of fact, which are not a part of the record. However, the district court made a docket entry on April 28, 1982, reflecting such findings. The order of Appellee was affirmed by the court on May 17, 1982, with the provision that, pending final judgment, Appellant would neither order, possess, dispense, administer, nor prescribe any controlled substance, as set forth in Tex.Rev. Civ.Stat.Ann. art. 4476–15 (Vernon Supp. 1982–1983) and the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236 (1970). Appellant's motion for new trial was overruled on May 21, 1982.

In his sole point of error, Appellant alleges that the trial court erred in upholding the revocation of Appellant's medical license, since there was not even a scintilla of evidence, much less substantial evidence, in the record that his failure to keep complete and accurate drug records was likely to deceive or defraud the public. We disagree.

The statute under which Appellant was charged states, in part:

Art. 4505. May refuse to admit certain persons:

The State Board of Medical Examiners may refuse to admit persons to its examinations, and to issue license to practice medicine to any person, for any of the following reasons:

(4) Unprofessional or dishonorable conduct which is likely to deceive or defraud the public. Unprofessional or dishonorable conduct shall include, but shall not be limited, to the following acts:

(B) *Failure to keep complete and accurate records of purchases and disposals of drugs* listed in Chapter 425, Acts of the 56th Legislature, Regular Session, 1959, as amended (Article 726d, Vernon's Texas Penal Code), or of narcotic drugs. A physician shall keep records of his purchases and disposals of the aforesaid drugs to include, but not limited to, date of purchase, sale or disposal of such drugs by the doctor, the name and address of the person receiving the drugs and the reason for disposing of or dispensing the drug to such person. *A failure to keep such records shall be grounds for revoking, cancelling,* suspending or probating *the license of any practitioner of medicine.* (Emphasis added).

Tex.Rev.Civ.Stat.Ann. art. 4506 (Vernon 1976) grants power to Appellee to cancel, revoke or suspend the license of a physician for causes enumerated in Tex.Rev.Civ.Stat. Ann. art. 4505 (Vernon 1976). An appeal from such revocation operates under the "substantial evidence" rule, as required by

Tex.Rev.Civ.Stat.Ann. arts. 4506 (Vernon 1976) and 6252–13a § 19 (Vernon Supp. 1982–1983).

Art. 4505(4)(B) contains three elements which must be established:

(1) Unprofessional or dishonorable conduct;

(2) likely to deceive or defraud;

(3) the public.

Reviewing the facts presented in Appellee's hearing, it is uncontroverted that the drug methaqualone is a drug listed in Chapter 425, Acts of the 56th Legislature, Regular Session, 1959, as amended (Article 726d, Vernon's Texas Penal Code). It is further undisputed that Appellant failed to keep complete and accurate records of purchases and disposals of methaqualone. Appellant's conduct was clearly unprofessional and dishonorable, pursuant to article 4505(4)(B).

■ Patients of a doctor are unquestionably members of "the public" within the meaning of the Act. *Texas State Board of Medical Examiners v. Koepsel,* 159 Tex. 479, 322 S.W.2d 609 (1959). Further, if a doctor treats members of his own family, they are considered "patients".

The only remaining question under article 4505(4)(B) is whether the conduct of Appellant was likely to deceive or defraud the public. Appellant directs this Court to Tex. Rev.Civ.Stat.Ann. art. 4495b § 3.08(4)(B), known as the Medical Practice Act. This act is not applicable because it became effective August 5, 1981, repealing article 4505, and the acts complained of were committed prior to August, 1981. It is important to note, however, that the new act states:

Sec. 3.08(4) unprofessional or dishonorable conduct that is likely to deceive or defraud the public or injure the public. Unprofessional or dishonorable conduct *likely to deceive or defraud the public* includes but is not limited to the following acts:

(B) failing to keep complete and accurate records . . . (Emphasis added);

whereas article 4505(4)(B) stated:

(4) Unprofessional or dishonorable conduct which is likely to deceive or defraud the public. Unprofessional or dishonorable conduct shall include, but shall not be limited to, the following acts:

(B) Failure to keep complete and accurate records . . .

■ It appears clear to this court that Vernon's Texas Penal Code.) It is further the Legislature intended to declare the failure to keep complete and accurate records of controlled substances conduct which was unprofessional or dishonorable and which was likely to deceive or defraud the public. This legislative intent was not expressed in article 4505(4)(B), the statute which applies in this case. Therefore, an affirmance by this court of the judgment of the court below requires that the record contain substantial evidence that Appellant's failure to keep complete and accurate records was likely to deceive or defraud the public. The evidence on this point includes the following:

1) Appellant did not produce accurate records, as required by law, for the drug methaqualone, when they were selected for audit by Appellee and the Department of Public Safety (D.P.S.).

2) Appellant failed to account for the drug methaqualone for dosage units numbering in multiples of thousands.

3) Appellant's two sons are drug addicts and have been drug addicts since their early teenage years.

4) Appellant's sons and their friends who were drug addicts stole drugs from their father to support their drug habits and to sell drugs on the street.

5) Appellant knew of the thefts and failed to report them to the Federal Drug Enforcement Administration or to the Texas Department of Public Safety, as required by law.

6) Appellant treated his sons and other drug addicts without reporting the treatment to the Board, as required by law.

7) Appellant alleges two thefts of his office wherein drugs were stolen; however, no list of stolen drugs were supplied to the Houston Police Department, Texas D.P.S. or Federal D.E.A., as required by law.

8) Appellee introduced as evidence drug order/shipment forms which proved the amounts of methaqualone ordered by and shipped to Appellant. Appellant alleges that not all shipments were received, but wholly failed to offer any proof thereof.

9) All the methaqualone ordered by Appellant was in 300 milligram tablets, the strongest dosage manufactured.

10) Appellant treated his sons' drug abuse by giving each of them 750 milligrams each night. This same dosage was given continuously for approximately three years.

11) Appellee's expert witness, Dr. James F. Maddox, testified that 300 milligrams is the maximum recommended daily dosage. Dr. Maddox further testified that prolonged use (over three to four months) of methaqualone was not recommended and was dangerous to the health of the patient.

12) Appellant treats his sons and other drug addicts from his "emergency bag," and he failed to keep complete and accurate records of methaqualone prescribed and dispensed from his "emergency bag."

13) Appellant treated patients suffering from insomnia and/or depression with large dosages of methaqualone.

14) Dr. Maddox testified that methaqualone is not recommended for treatment of insomnia or depression.

15) Appellant's records reveal Appellant ordered and was shipped over 148,000 units of 300 milligram methaqualone dosages in a two year period.

16) Dr. Maddox testified such usage was extravagantly high, even for a specialist in the field of drug abuse.

17) Appellant's patient charts reveal Appellant dispensed methaqualone (300 milligrams) to his patients in lots of 60 dosages at a time.

18) Dr. Maddox testified it was very unusual for a doctor to supply the drugs rather than to write a prescription to be filled by a pharmacy; and further, that dispensing methaqualone (300 milligrams each) 60 at a time was not recommended as a safe procedure.

19) A very large percentage of Appellant's patients were put on the maximum dosage, or twice the recommended maximum dosage of methaqualone, in the beginning of their treatment.

20) Appellant's patient charts show less than one percent of his patients ever received a reduced dosage of methaqualone.

21) Dr. Maddox testified it was very unusual, and not a safe procedure, to recommend maximum dosage of methaqualone initially; and, definitely not recommended medical procedure to leave patients on long dosages of methaqualone for extended periods of time. If methaqualone is prescribed at all, it is in minimum dosages that are then reduced.

22) Appellant testified methaqualone was non-addictive and not dangerous to the patient.

23) Dr. Maddox testified that methaqualone was addictive and dangerous.

24) A large percentage of Appellant's patients were given 120 methaqualone tablets (300 milligrams each) in a 30-day period because their original 60 were "lost," "stolen," or "got wet." Some of these patients "lost" their drugs on more than one occasion.

To be deceived is "to have mistaken confidence in." Webster's New International Dictionary (2d ed. 1953). The failure of Appellant to keep complete and accurate records of his purchases and disposals of methaqualone, *coupled with* the manner in which Appellant dispensed methaqualone to his family and other patients, was likely to

deceive Appellant's patients into having mistaken confidence in Appellant and in Appellant's methods of treatment. Further, Appellant's failure to keep accurate and complete records of his purchases and disposals of methaqualone was likely to defraud the public because such failure was the instrumentality for permitting thousands of maximum dosages of the drug to find their way into the illicit and illegal traffic of drugs.

Article 4505(4) was intended to differentiate acts which were merely unethical as between doctors, and that conduct which affected the general public.

> But when the unprofessional conduct . . . is of such a character as to deceive or defraud the public, then the law denounces such conduct and strips the offender of the means which made it possible to impose upon the credulous and unwary. *Berry v. State,* 135 S.W. 631 (Tex.Civ. App.1911, writ ref'd).

> It is well recognized that in the professions dealing with human ills and their treatment, it is the policy of the people, expressed in legislative enactments, to require those who practice such profession to conform to the highest moral standards. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners but protection against those who would prey upon those particularly susceptible to imposition. *Texas State Board of Medical Examiners v. Koepsel,* 159 Tex. at ——, 322 S.W.2d at 612.

It was not the intention of the Legislature to clothe a person with a certificate of professional skill in order to license him to intentionally perform grossly negligent or dangerous acts without there being any professional discipline. For the legal system to do anything less would be to acquiesce in or to ratify the grossly unprofessional or dishonorable conduct which was likely to deceive or defraud the public, and which was carried out under the cloak of medical treatment.

The judgment of the trial court is affirmed.